UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHELE TORRICE,

                          Plaintiff,                         Case Number 15-11747

v.                                               Honorable David M. Lawson

NGS CORESOURCE,

                          Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Michelle Torrice was fired from her job as a client coordinator by defendant NGS Coresource after nearly thirteen years with the company. She filed a complaint alleging age discrimination and retaliation, invoking the applicable federal and Michigan statutes. The matter is before the Court on the defendant's motion for summary judgment. The Court heard oral argument on June 22, 2016. The record fails to support the plaintiff's retaliation claim, because proof of causation is wanting. However, fact questions preclude summary judgment on the claim that the defendant fired plaintiff "because of" her age. *See* 29 U.S.C. § 623(a)(1); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 169 (2009). Therefore, the Court will grant in part and deny in part the motion for summary judgment.

I.

Employment cases are notoriously fact intensive. This one is no exception. Therefore, a detailed discussion of the record follows.

According to the parties' documented submissions, the plaintiff began employment with NGS America as an account manager on August 21, 2000. NGS America was a local third-party administrator of healthcare claims that was later acquired by Coresource in 2006, a national third-

party healthcare claims administrator.  According to Torrice, the acquisition did not have an impact on NGS America until 2009, when the combined entity began using the name NGS Coresource.  Torrice's duties involved new group implementation and business retention, with responsibility to resolve claim issues raised by clients and insurance agents.  After 13 years of employment, Torrice was terminated on March 15, 2013.  She alleges that at the termination meeting, the company's regional president said, "I'm not saying you're not a good employee, it's just not a good fit."

It appears that the defendant regularly reviewed its employees' work performance.  In Torrice's 2002 employee performance evaluation, her supervisor, Patrice LeBlanc, gave her high marks in all areas and stated that "[Torrice] has an excellent sense of responsibility and accountability.  She has demonstrated these with good organizational and follow up skills.  While she has a diverse book of business with many client and agent contacts, she manages to meet and sometimes exceed their expectations."  LeBlanc also said that "[Torrice] is well liked by her coworkers and is personable with all her contacts. [She] is an asset to not only Client Services but also to NGS [America]."

In 2003, Torrice was promoted to Senior Account Manager.  In March of 2006, Torrice received a review that identified "Implementation," "Client Advocate," and "Ongoing Service," as "key deliverables."  The evaluation was again done by LeBlanc, and Torrice received 100% in each category.  LeBlanc noted, however, that Torrice could become frustrated and project an attitude of being "so busy."

In Torrice's 2008 evaluation, although generally positive, LeBlanc noted, that "[w]hile she accomplishes the objective, her frustration can come across and be perceived as being negative." It also noted that Torrice needed "more commitment to the Client Services task forces in order to

-2-

promote continuous improvement."   The evaluator scored Torrice at 100% in both the Implementation and Client Advocate categories, but at 89% in Ongoing Services that year.

In 2009, Torrice's evaluator rated her as meeting expectations in 21 of the 24 reviewed areas, and developing in three.  The evaluation allowed supervisors to indicate that an employee "Does Not Meet" expectations, is "Developing," "Meets Expectations," or "Exceeds Expectations" in a given category.  LeBlanc noted that "[Torrice] need[ed] to be aware at how she c[ame] across to both internal & external customers.  At times, she becomes abrupt, frustrated and overwhelmed which can be perceived negatively by clients and co-workers."

Torrice alleges that despite Coresource's acquisition of NGS America in 2006, her position and the management structure remained the same within NGS.  However, Torrice alleges that the company "changed" in 2009 when Kimberly Fiori was promoted to Regional President of NGS Coresource.  As part of a restructuring conducted at the time of Fiori's promotion, the account manager position was eliminated.  Employees who held the title of Account Manager or Senior Account Manager, such as Torrice, were made either Client Coordinators or Client Managers.  The client coordinator position was subordinate to the client manager position.  Torrice alleges that in general, the older, more experienced account managers were demoted to coordinators, while the younger individuals were all placed into manager positions.  She also alleges that along with herself (age 57), other Account Managers such as Mary Fraser, (age 53), Melissa Brown, (age 44), Lori Grden, (age 48), and Pat Picklo, (age 61) were all demoted to coordinator positions.  By contrast, Torrice asserts, Karla Woita (age 40) and Laurie Brinch, (age 43) were both made client managers, and NGS hired Kim Kulas (age 38) and Sara Million (age 28) as client managers.  Torrice alleges that although one former account manager, Debbie Nagle (age 53), was assigned as a client manager,

she had not truly been an account manager as she had full responsibility for only one client, Ohio State University, and left the department a few months later.

According to Karla Woita, the plaintiff's supervisor during her last six months of employment, client managers and client coordinators work together as teams to service clients. Typically, one or two client coordinators would report to each client manager. Woita described a client manager as a more strategic position that identifies opportunities to "upsell" clients, whereas a client coordinator manages the day-to-day operation of a client's needs.

According to Ann Kroepel from the human resources department, it was Kim Alcott, the former NGS America President, and LeBlanc who made the decision to designate the former client manager and senior client manager personnel as either client coordinators or client managers in 2009. Torrice concedes that she does not know who made the individual decisions. Nonetheless, Torrice alleges that when Fiori became president in 2009, she made it clear that she wanted to remove the older employees.

Torrice alleges that at some point in 2010, Fiori approached her and asked who Torrice thought she should fire. Fiori allegedly told Torrice that she wanted to "bring in fresh new young people from the outside." Torrice says that she did not consider the comment to be age-based at the time. Instead, she thought the comment was directed at the longevity of the current employees and a desire to bring in fresh ideas. Subsequently, a team meeting of client managers and coordinators was held. Melissa Brown, Lori Grden, Patricia Picklo, and Torrice were all in attendance. At the meeting, Melissa Brown, a client coordinator, alleges that Fiori stated that she wanted to get rid of many employees, but that managers had to write them up before that could happen. The purported

reason for the separations was so that Fiori could "bring in new, younger blood." Grden and Picklo described the meeting and Fiori's comments in substantially the same way.

Melissa Brown submitted an affidavit stating that she began working for NGS America in 1985. She alleges that at some point after the team meeting, Woita informed her that she needed to take a class to improve her Excel skills, even though Brown was familiar with Excel and had been using it in her position as client coordinator. She alleged that in 2010, she received three performance write-ups from Woita, which had no basis in fact. After 25 years with NGS, Brown resigned her employment in 2010 because she believed it was just a matter of time before Woita, her supervisor, would terminate her. Brown believes that she was targeted because of her age.

Lori Grden (48 when she was demoted to client coordinator) averred that she observed supervisors micromanaging and being highly critical of her coworkers. She alleges that she was aware of the write-ups that her coworkers were receiving, and rather than be forced out like her coworkers, she voluntarily left NGS to take a position elsewhere in 2014. She believed that if she had not done so, it was only a matter of time before she would have been targeted and written up.

Patricia Picklo (age 65) alleged in her affidavit that upon returning from a vacation in July 2013, she was informed that she had left work for other people to do while she was on vacation. She was told that NGS had received a number of complaints from both coworkers and clients, although she was never told who made the complaints. Picklo explained that her vacation had been planned for a long time and that she had made sure all of her work was in order before she left on vacation. She stated that she was told she would be written up unless she chose to seek other positions within the company for which she says she was not qualified. Picklo voluntarily left her position in July 2013.

-5-

In 2010, LeBlanc gave Torrice a written warning and put her on a Performance Improvement Plan ("PIP"). The PIP, however, appears to be more of an incident report than an improvement plan. The PIP described a disagreement between Torrice and LeBlanc concerning driving to a client meeting in Ohio. The PIP stated that Torrice wanted to drive separately, in order to receive the company mileage reimbursement, but LeBlanc insisted that they drive together in order to conserve company funds, which was consistent with NGS policy. LeBlanc also noted in the PIP that Torrice "continue[d] to be vocal about her displeasure with her position as Client Coordinator." The recommendation within the PIP was that "[i]f she wanted to be a Client Manager, she should start preparing herself for that and that shouldn't be difficult because she has done part of that position's responsibilities" in the past.

In Torrice's 2010 evaluation, LeBlanc reported that she met or exceeded expectations in all but two of 25 areas. The evaluator noted that she was "developing" in the categories of "Responds to changes with a positive attitude and demonstrates readiness to learn new ways to accomplish objectives," and "Accepts direction/feedback in a positive manner." The 2010 evaluation concluded with the following statement by LeBlanc:

> [Torrice] needs to be cognizant that her obvious frustration level can negatively affect others' perception of not only her capabilities as an individual, but the company as well. I am concerned that our clients can sense her frustration and unhappiness as well. We have had several discussions regarding this. My suggestion/guidance has been that she take this opportunity to make the position her own, doing the best job, going above and beyond wherever and whenever . . . possible.

In 2011, LeBlanc took another position within NGS, and Kimberly Kulas replaced LeBlanc as Torrice's client manager. In the plaintiff's 2011 evaluation, Kulas indicated that Torrice met or exceeded expectations in all but one category. Kulas noted that Torrice was "developing" in the

-6-

category "Responds to changes with a positive attitude and demonstrates readiness to learn new ways to accomplish objectives." However, in the "Assists Client Manager with problem solving/issue resolution as necessary," where Kulas indicated Torrice exceeded expectations, Kulas also commented that Torrice is "one of the greatest assets of my training and development at NGS and I appreciate [her] guidance." She concluded with the following statement:

> Your commitment to our teams' partnership has been outstanding in the last 8 months. You've helped to provide a cohesive team environment for [LeBlanc] & I. Several other department managers have also provided positive feedback with regard to your interactions and willingness to help solve problems recently. I look forward to your continued improvement in the support of other members of our department and the upcoming goals & initiatives with regard to the Path Forward projects. I anticipate you will set goals to continue these positive interactions and agree to assist other departments when needed.

In 2011, Torrice received a merit-based pay increase.

Kulas resigned in 2012. Sara Million (age 29) was hired to replace Kulas. Million did not begin immediately after Kulas' resignation, so Woita became Torrice's supervisor in either late August or early September of 2012. After Million took over for Kulas, however, Torrice remained under Woita's supervision, even though it appears that Torrice and Woita serviced different clients.

Woita testified that she was dissatisfied with Torrice from the day she started supervising her. Within approximately a month, Woita issued a written warning to Torrice dated October 5, 2012, which raised three issues. *First*, the warning stated that on September 24, 2012, Woita instructed Torrice to attend an open enrollment meeting on October 28 to 29, 2012 in Paducah, Kentucky, but that on September 26, 2012, Torrice advised Woita that she would be unable to travel to Paducah because she was babysitting her granddaughter that weekend. Nonetheless, Torrice testified that she began making travel arrangements to go to Paducah, even though she would have to cancel family plans. Torrice alleges that Woita later told her that she did not need her to go to

-7-

Paducah after all.  Torrice alleges that rather than being sent to Paducah, Woita sent her to Lima, Ohio to do Webinars, which Torrice says that she did.

*Second*, the warning stated that Torrice refused to learn a plan-modeling tool as requested by a manager from another department.  It noted that both the manager from another department and Woita asked her to complete training in the plan-modeling tool, but Torrice refused.  Torrice testified that she had too many obligations of her own to learn a tool to service customers that were not her own.  Woita complained that Torrice consistently left the office at 4:30 p.m., her scheduled end time, and did not work from home because Torrice said that she did not know how to access the virtual private network (VPN) in the Internet.  Woita conceded, however, that working from home was not a requirement of Torrice's position.  Woita testified that she was going to learn the tool with Torrice, yet never did, perhaps because the tool was subsequently discontinued.

*Third*, Woita complained that Torrice failed to produce quarterly reports to a client regarding performance guarantees.  However, Torrice alleges that she had never been made aware that the service agreement for that client had been signed.  Torrice contends that it is the salesperson's responsibility to inform client management that a service agreement has been signed.  And even though the service contract had been signed a year earlier, Torrice was not informed until September 2012.  Torrice alleges that she worked diligently to complete the delinquent reports once she was informed.

On December 12, 2012, Woita wrote an addendum to the October 5, 2012 written warning. In addition to restating the deficiencies from the October 5 warning, the addendum also stated that Torrice had been asking coworkers how to use some of the web enroll processes, even though the processes and procedures had been in place since 2009.  And the addendum noted that coworkers

-8-

had been complaining about Torrice's negative attitude and outbursts after hanging up with clients. Torrice was then put on another PIP and assigned bi-weekly reviews for the next 45 days. The addendum instructed Torrice to become proficient in a number of computer programs, including Excel, and to learn how to access the VPN. She also was instructed to complete required tasks without being reminded and to conduct herself in a professional manner. The addendum stated that if her performance did not improve in the next 45 days, she may be disciplined further or terminated.

The meeting notes from the December 27, 2012 follow-up meeting with Kroepel and Woita stated that Torrice had emailed the delinquent quarterly reports to Woita and the salesperson, and was waiting for their responses. Nonetheless, Woita informed Torrice that it was her responsibility to meet the needs of the client. Torrice was asked whether she had looked into taking an Excel class, and Torrice allegedly said that she had not, but it was her understanding that another employee was looking into a group class. Torrice was asked whether she was able to access the VPN from home, and she allegedly responded that she never works from home because her computer was too slow.

Woita prepared Torrice's 2012 performance evaluation. The company was using a new format; however, the copy furnished by the defendant is difficult to read because of heavy shading. Nonetheless, it appears that both Woita and Torrice were asked to rate Torrice on a scale of one to five. Torrice rated herself with threes and fours, consistent with her previous evaluations, while Woita rated her performance a one in every category.

The January 10, 2013 bi-weekly notes stated that Torrice still had not completed Excel training, even though Torrice said that she was proficient in Excel. The quarterly reports were addressed again and Torrice was told that the reports needed to go out, but that the salesperson needed to be given one more chance to review the reports. Torrice allegedly said she could not

understand why she was being "blamed" for the delinquent reports when it was the salesperson who was not responding to her emails. And she asked why she was being subjected to this kind of treatment when she had been doing her job for years without any complaints. The response was that clients are more demanding now and there are new tools and skills that Torrice needed to learn to meet customer needs, including being able to use the VPN from home.

On January 22, 2013, Torrice wrote an email to Ann Kroepel and the Human Resources Manager stating that she believed that she was being discriminated against because of her age. Kroepel did not investigate Torrice's allegation of age discrimination, she said, because she had been involved with the plaintiff's bi-weekly meetings and was well aware of the situation. On January 23, 2013, Torrice attended her final bi-weekly meeting, and according to the notes of the meeting, the encounter became contentious. The notes make no mention of the email complaining of age discrimination.

Torrice stated that after the October written warning she was always "on edge." She alleges that Woita was "constantly nit-picking and criticizing everything that [she] did. [Woita] spoke to [her] in a loud, disrespectful tone. [Torrice] was worried every day that [she] would be fired." Torrice recalled Fiori's comments about writing up employees in order to get rid of them to bring in new fresh young employees. During this time, Torrice began to suspect that she was being targeted because of her age, which prompted her to send the email to the human resources department.

Torrice was terminated on March 15, 2013. She maintains that at the termination meeting, Fiori said, "I'm not saying you're not a good employee, it's just not a good fit." Following her termination, Torrice's duties were allegedly assumed by Jennifer Sliger. The plaintiff contends that

-10-

Sliger was 32 years old at the time.  The defendant argues that the record does not contain a clear indication of Sliger's age, but defense counsel confirmed that fact at oral argument on the motion, and it does not appear to be in dispute.  Torrice alleges that during the time she was being scrutinized, NGS was hiring young replacements. For instance, NGS hired Jennifer Turner, age 25, in October 2012 and David Mays, age 31, in November 2012, as client coordinators.  After the plaintiff filed her EEOC charge, David Kenney, Vice President of Human Resources was directed to compile the ages of the 238 NGS employees, and concluded that approximately 80% of the defendant's employees were over the age of 40, and 15% were over the age of 60.

The plaintiff filed a charge of discrimination with the EEOC on October 9, 2013.  On March 4, 2015, the EEOC issued a Notice of Right to Sue, which the plaintiff received on March 7, 2015. The plaintiff filed her initial complaint in this Court on May 15, 2015, and an amended complaint on September 28, 2015.  The plaintiff's amended complaint contains two counts: (Count I) Violation of the Age Discrimination Employment Act of 1967; and (Count II) Violation of the Elliot-Larsen Civil Rights Act.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Sixth Circuit has explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a), (b). Such a motion presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Highland Capital*, 350 F.3d at 546 (quoting *Anderson*, 477 U.S. at 252) (quotations omitted).

-12-

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

The Age Discrimination in Employment Act "forbids an employer 'to discharge . . . or otherwise discriminate against any individual . . . with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) (quoting 29 U.S.C. § 623(a)(1)). In addition, "[t]he ADEA prohibits employers from retaliating against an employee for opposing or reporting age discrimination." *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 288 (6th Cir. 2012) (citing 29 U.S.C. § 623(d)). The plaintiff brings her age discrimination claims based on both disperate treatment and retaliation theories, citing both the Age Discrimination Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"),

-13-

Mich. Comp. Laws § 37.2201, *et seq.*  "ELCRA claims are analyzed under the same standards as federal ADEA claims."  *Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009).

### A.

To prove unlawful disperate treatment under the ADEA, the plaintiff must offer evidence that the employer's adverse action would not have been taken against her but for her age.  *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).  "[I]t is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the ADEA's 'because of' language requires that a plaintiff 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the "but-for" cause of the challenged employer decision.'"  *Scheick v. Tecumseh Pub. Sch.*, 766 F.3d 523, 529 (6th Cir. 2014) (quoting *Gross*, 557 U.S. at 169).  As noted, these elements may be established by direct or circumstantial evidence.  *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003); *see also Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009).

### 1.

Direct evidence of discrimination is evidence that, "if believed, requires the conclusion that age was the 'but for' cause of the employment decision."  *Id.* at 530.  Direct evidence does not require the factfinder to draw any inferences to reach that conclusion.  *Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir. 2013).  "Evidence of discrimination is not considered direct evidence unless a[n improper] motivation is explicitly expressed."  *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006).

The plaintiff argues that Fiori's alleged comments that she wanted to "bring in fresh new young people from the outside," and that she wanted to get rid of many employees, but that

-14-

managers had to write them up before that could happen are direct evidence of age discrimination. Even though the plaintiff found the comments shocking, she admits that at first she did not view Fiori's alleged comments as being age-based.

The plaintiff points to *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003), as an example of comments amounting to direct evidence of age discrimination. There, comments directed at the plaintiff described him as "a bearded grumpy old man," "pops," and "old man." *Id.* at 569-72. Similarly, the plaintiff argues that a supervisor's comments stating that "oldtimers, they got thirty years, they ought to get their ass out of here," was also direct evidence of discrimination. *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 380 (6th Cir. 1993). The plaintiff argues that the Michigan Supreme Court has found that a supervisor's statement that the plaintiff was "getting too old for this shit" constituted direct evidence of discrimination. *DeBrow v. Century 21 Great Lakes, Inc.*, 463 Mich. 534, 540, 620 N.W.2d 836, 839 (2001); *see also Downey v. Charlevoix Cty. Bd. of Rd. Comm'rs*, 227 Mich. App. 621, 633, 576 N.W.2d 712, 718 (1998) (stating that "getting rid of older employees" because they "weren't doing the job" was direct evidence of age discrimination).

Those cases all contain blatant remarks that can only be interpreted as animus based on age. Here, however, the comments of Fiori, a regional president of NGS at the time she made her alleged comments (there is no question that she was a decision maker), require at least one inferential step to conclude that they convey an express, improper motivation. Fiori allegedly said that she wanted to bring young people into the company, and that she wanted to get rid of a number of employees by perhaps fabricating written complaints about them. The inference is that the people she allegedly wanted to get rid of were significantly older than the "young" employees she wished to bring in.

-15-

The comments on their own are not as blatant as the comments made in the cases cited by the plaintiff. The Sixth Circuit explained that comments by management about the "general need to lower the average age of their workforce . . . would not constitute direct evidence of age-based bias." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004).

Such comments may "raise some suspicion as to [the employer's] motives" and support a *prima facie* case of employment discrimination based on circumstantial evidence. *Ibid.* But Fiori's alleged comments are not so blatantly discriminatory; they are susceptible of different meanings. Certainly age-based animus could be inferred from them, but they do not amount to direct evidence of discrimination.

2.

To prevail on a disparate-treatment claim under the ADEA, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross*, 557 U.S. at 176 (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008), and *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63-64 & n.14 (2007)). The Sixth Circuit has held, however, that the application of the *McDonnell Douglas* framework, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine whether the plaintiff has offered sufficient circumstantial proof of illegal motive at the summary judgment stage remains unaffected by *Gross*. *Geiger*, 579 F.3d at 622. Under that framework, the plaintiff must offer evidence establishing a *prima facie* case of age discrimination. The employer then must offer a legitimate reason for taking the adverse action against the employee. The employee then must rebut that reason by showing that it was a pretext for age discrimination. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008) (citations omitted). The burden

-16-

of persuasion throughout remains with the employee.  *Scheick*, 766 F.3d at 529 (quoting *Gross*, 557 U.S. at 180).

To establish a *prima facie* case of age discrimination, the plaintiff must show that she "(1) was a member of a protected class of persons (i.e., persons 40 years of age or over), (2) was discharged, (3) was qualified for the position held, and (4) was replaced by someone outside of the protected class."  *Allen*, 545 F.3d at 394.  To be "outside the protected class," however, the comparator should be substantially younger than the plaintiff.  *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).

The defendant does not dispute that Torrice was over 40 years of age or that she suffered an adverse employment action.  *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (defining "adverse employment action" an employer effectuating "a significant change in employment status, such as . . . firing.").  The defendant's main argument is that Torrice was not qualified for the position she held.  However, the defendant also argues that the plaintiff failed to cite evidence in the record that Torrice was replaced by Jennifer Sliger or that Sliger was 32 years old.  However, Kroepel gave evidence in her deposition that supports the inference that  Sliger replaced the plaintiff:

> Q:   After [Torrice]'s termination, did anyone else report to [Woita] besides Brittney [Dekiere]?
> A:   We -- I'm trying to think.  Jennifer Sliger reports to [Woita].
> Q:   Jennifer who?
> A:   Sliger, S-L-I-G-E-R.
> Q:   Is she a client coordinator?
> A:   She is.
> Q:   When was she hired?
> A:   She was in our claims department, and she applied for the position.
> Q:   Is that after Michele's termination?
> A:   Yes.
> Q:   How old is Jennifer?

-17-

A:      I don't know.

Brittany Dekiere worked for Woita as a client coordinator while Torrice was still employed. Therefore, it reasonable to infer that Sliger took over Torrice's position after she was terminated. And although Kroepel could not testify to Sliger's age, defense counsel confirmed at oral argument that Sliger was 32 years old, substantially younger than the plaintiff.

The defendant insists that Torrice has not shown that she was "qualified" for her position, because her supervisors reasonably believed that her performance was deficient, which was a judgment entitled to deference. However, "[a]t the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (en banc). "The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id.* at 575-76. "[T]he inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 576.

The defendant argues that Torrice does not come close to establishing a *prima facie* case, because three different managers agreed that Torrice was not meeting the requirements of her position. The defendant overstates its position. The plaintiff has made a *prima facie* showing that she was qualified for the position because she performed the position for 13 years. The subjective beliefs of the parties are irrelevant at this step in the process. Torrice has made a *prima facie* showing that she was a victim of age discrimination by the defendant.

-18-

The defendant has met its burden of articulating a legitimate nondiscriminatory reason for Torrice's termination. The defendant's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). The defendant argues that Torrice was terminated because she did not meet her employer's job performance standards. The defendant argues that from 2008 to 2013, her performance deteriorated resulting in her eventual termination. The defendant has met its burden at this stage of the analysis.

The plaintiff maintains, however, that there are genuine disputes of fact over whether the defendant's explanation of her termination were pretextual. "A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Wexler*, 317 F.3d at 576 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

However, where an employee seeks to establish pretext by showing the employer's proffered reasons have no basis in fact, as the plaintiff does here, the Sixth Circuit recognizes an "honest belief rule." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012).

> Under [this] rule, an employer's proffered reason is considered honestly held where the employer can establish it reasonably reli[ed] on particularized facts that were before it at the time the decision was made. Thereafter, the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held. An employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact.

*Ibid.* (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)). Nonetheless, courts "will not 'blindly assume that an employer's description of its reasons is honest.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quoting *Smith v.*

-19-

*Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). "Therefore, '[w]hen the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process "unworthy of credence," then any reliance placed by the employer in such a process cannot be said to be honestly held.'" *Ibid.* (quoting *Smith*, 155 F.3d 807-08).

In addition to disputing almost every factual allegation made by the plaintiff, the defendant makes three arguments to debunk the pretext accusation. It argues that the plaintiff's performance evaluations show conclusively that the plaintiff was not performing her position adequately; that Fiori's alleged statements were made four years prior to the plaintiff's termination and therefore are not related to the plaintiff's termination; and that 80% of the defendant's workforce is over 40, presumably suggesting that it does not discriminate against employees over 40.

There are problems with the defendant's assertions. *First*, it is far from conclusive that the plaintiff's performance evaluations are consistently negative. The defendant points out correctly that one of the recurring criticisms in the plaintiff's evaluations is that she becomes frustrated and her demeanor can be perceived as negative. However, the defendant's characterizations of consistently poor evaluations are disingenuous. With the exception of Woita's evaluation, the rest of the plaintiff's reviews are consistently positive. Arguably, the plaintiff's best evaluation was in 2011, when her new supervisor stated that the plaintiff had "been one of the greatest assets of my training and development at NGS and I appreciate [her] guidance." And her supervisor noted that she exceeded expectations in her ability to assist her client manager. The plaintiff subsequently received a merit-based raise.

-20-

The defendant also argues, however, that the plaintiff was put on two different PIPs, one by LeBlanc and one by Woita. The defendant argues that the PIP that the plaintiff received from LeBlanc in 2010 was an improvement plan because that is what the document was titled. That circular reasoning is unpersuasive and unconvincing. The 2010 PIP identifies two issues, and neither appears to relate to job performance. The first issue described the plaintiff's dissatisfaction with the company policy concerning mileage reimbursements for work-related travel, and the second concerned her dissatisfaction with her demotion to a client coordinator from a senior account manager. The PIP states that the steps to improve the first issue are non-applicable, and the steps to improve the second issue are to seek out opportunities to demonstrate the plaintiff's capabilities. LeBlanc suggested that the plaintiff should prepare herself for a client manager position and apply for the position, which LeBlanc said should not be difficult because the plaintiff had already taken on some of a client manager's responsibilities. At worst, the PIP reflects the plaintiff's continued frustration with NGS. At best, the plaintiff's supervisor was advising her to work hard and apply to be a client manager. Rather than indicating a performance problem, this first PIP tends to support the inference that management was setting about to build a case against older workers to support termination.

*Second*, the defendant argues that Fiori's comments occurred too long ago to relate to the plaintiff's termination. Certainly, "such statements will not constitute direct evidence." *Rowan*, 360 F.3d at 550. But Fiori's statements "may well betray a bias that older workers are less valuable or competent." *Ibid*. Fiori's comments amount to circumstantial evidence of bias. Determining whether the comments were made and how much weight to give them is better left to a jury.

-21-

Furthermore, the alleged comments suggest that Fiori was directing her managers to fabricate reasons to terminate current employees.  Subsequently, the plaintiff and several other of the older client coordinators alleged that the defendant fabricated reasons to terminate them.  A jury could infer from those statements and actions that the defendant had a practice of forcing out employees based on their age rather than ability.  The defendant argues that the affiants all voluntarily resigned.  However, while technically accurate, the affiants' allegations could also be viewed as constructive discharge.

*Third*, the defendant alleges that 80% of the defendant's workforce is over 40.  This allegation would be more persuasive if the defendant provided some breakdown of these alleged older employees' positions.  "'Statistics taken in isolation are generally not probative of . . . discrimination,'" *see Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1114-15 (10th Cir. 2007), or the absence of it.  The plaintiff's position, for example, in part, required her to travel to clients' locations, make presentations, and be available during open enrollments.  She interacted directly with the clients.  It could be that all of the employees in accounting, human resources, and the information technology department are all over 40, and that all of the client service employees are under 40.  Additionally, Fiori is a regional president.  There are no allegations that she had supervisory authority over all of the defendant's 238 employees.  A more narrow statistic related to client services employees supervised by Fiori would be more useful.  The defendant's statistics offer little in isolation.

The defendant insists that the plaintiff has offered no evidence that the decision makers' belief that the plaintiff was not qualified for her position was not honestly held.  But taking the facts in the light most favorable to the plaintiff, Torrice performed her position successfully for 13 years,

-22-

she received favorable yearly evaluations, she was promoted, and she was given a merit-based raise as late as 2011. The regional president of the company allegedly said that she wanted to hire young employees from outside the company; and that she would like to get rid of many of the existing employees, but that managers had to write them up before that could happen. In addition to her own testimony and evaluations, the plaintiff supports her allegations with the affidavits of three former employees who corroborated her version of the 2010 meeting where President Fiori allegedly made the discriminatory comments. When Fiori fired the plaintiff, she allegedly stated that the plaintiff was not being terminated because she was "not a good employee, it's just not a good fit."

Furthermore, the plaintiff's evaluations did not deteriorate in her last three to four months of employment. They completely crashed at the hands of her new supervisor. It may be as the defendant argues that NGS changed and the plaintiff was unwilling or was unable to change with it. On the other hand, it may be, as the plaintiff argues, that she was the victim of age-based discrimination. "Courts have recognized that in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004) (internal marks and citations omitted). The genuine disputed material facts in this case could lead a reasonable jury to conclude that the plaintiff was discriminated against because of her age and that its proffered reasons for the plaintiff's termination were pretextual.

The defendant's argument that it held an honest belief that the plaintiff could no longer perform her job duties is undermined by the objective evidence. It is difficult to reconcile the defendant's mischaracterization of the plaintiff's past evaluations, which it asserts it relied on in

-23-

making the termination decision, with the actual evaluations. And all of the proffered reasons for the plaintiff's deficient performance in her last four months of employment — failure to go to Paducah, failure to supply quarterly reports, and not being proficient in various programs — are in dispute. And perhaps most telling is that Fiori allegedly told the plaintiff at the time of her termination that "I'm not saying you're not a good employee, it's just not a good fit." An inference can be drawn from that comment that it was something other than the plaintiff's job performance that motivated her termination. A jury could find that the other reason might have been age because the plaintiff did not fit the defendant's image of a client coordinator. The defendant is not entitled to summary judgment on the plaintiff's disperate treatment age discrimination claim.

## B.

"The ADEA prohibits employers from retaliating against an employee for opposing or reporting age discrimination." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012) (citing 29 U.S.C. § 623(d)). The Sixth Circuit has stated that "Title VII's anti-retaliation provision is similar in relevant respects to the ADEA's anti-retaliation provision, and that it is therefore appropriate to look to cases construing Title VII as a source of authority for interpreting the ADEA's anti-retaliation clause." *Fox v. Eagle Distributing Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007). For analytical purposes, Michigan's Elliott-Larsen Act resembles federal law, and the same evidentiary burdens prevail as in Title VII cases. *See In re Rodriguez*, 487 F.3d at 1008; *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004); *Lytle v. Malady*, 458 Mich. 153, 172-73, 579 N.W.2d 906, 914-15 (1998).

The plaintiff premises her retaliation claim on the theory that she was not terminated at the end of her PIP with Woita, but her firing occurred after she sent an email to the human resources

department complaining of age discrimination. She appears to reason that because she was not fired at that time, she must have been in compliance with the PIP. "To establish a prima facie case of retaliation . . ., a plaintiff must show that '(1) she engaged in a protected activity, (2) the defending party was aware that the [plaintiff] had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and [the] adverse action.'" *Ibid.* (quoting *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 879 N.E.2d 174, 180 (2007)). "As with age discrimination claims, once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to 'offer a non-discriminatory reason for the adverse employment action.'" *Ibid.* (quoting *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009). "If the defendant meets its burden, the plaintiff then has the burden to 'demonstrate that the proffered reason was mere pretext.'" *Ibid.* (quoting *Ladd*, 552 F.3d at 502).

The plaintiff's complaint to human resources constitutes protected activity, and it is clear that the defendant was aware of the complaint. *See Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000)). And the defendant discharged the plaintiff, which, as noted above, is an adverse employment action. The proof of causation, however, is wanting. The plaintiff offers no evidence connecting her complaint to her termination, other than one came after the other.

Certainly, temporal proximity sometimes can satisfy the standard at the summary judgment stage. But the proximity of one to the other must be "very close in time." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee

-25-

must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Ibid.* (citing *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001)).

The plaintiff made her complaint on January 22, 2012 and she was terminated on March 15, 2013. Although the causal connection element can be satisfied by a termination within a few months of engaging in protected activity, *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007), the record demonstrates without dispute that the defendant was contemplating terminating the plaintiff well before her age discrimination complaint. In fact, the plaintiff's theory is based on the premise that the company, under Fiori's leadership, had embarked on a program to eliminate older workers in positions that entailed direct client contact.

The plaintiff testified she believed that she could be terminated at any time while she was under the supervision of Woita. And it is clear from the record that the defendant had contemplated her termination in October of 2012 when it issued a warning to the plaintiff, and Woita subsequently placed the plaintiff on a PIP threatening termination for failing to improve. Additionally, Woita gave the plaintiff the lowest score possible on her 2012 yearly evaluation. The notes from the plaintiff's final bi-weekly evaluation could not lead a reasonable factfinder to believe that the plaintiff had met her improvement goals. The notes say — true or false — that the plaintiff had not improved in any of the allegedly deficient areas. When the plaintiff asked why she had never been praised for what she did well and mentioned a letter than she had drafted and took pride in, Woita described all of the deficiencies in the letter. Whether the termination decision was based on an illegal motive remains in dispute, but there can be no doubt that the plaintiff's termination was inevitable.

The plaintiff also points to the "significance" that her age discrimination complaint was not investigated. "However, it is not necessary 'that the decisional process used by the employer be optimal or that it left no stone unturned.'" *Blizzard*, 698 F.3d at 286 (quoting *Smith*, 155 F.3d at 807). Kroepel testified that she did not investigate the age discrimination claim because she had been involved with the plaintiff's bi-weekly meetings and was well aware of the situation. Therefore, she found no credence in the plaintiff's complaint. Perhaps Kroepel's process was not optimal, but it was not unfounded, either.

Taking the facts in the light most favorable to the plaintiff, her retaliation claim rests alone on the temporal proximity to the adverse employment action. And the surrounding circumstances make it clear that there was no causal connection between the plaintiff's complaint and her eventual termination.

### III.

The plaintiff has not supported her retaliation claim under either federal or state law on evidence that establishes a genuine dispute on a material fact. Her disperate treatment age discrimination claim, however, requires resolution by a jury.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt. #20, 21, 22] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the parts of Counts I and II of the plaintiff's complaint based on a retaliation theory are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the motion is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   July 6, 2016

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 6, 2016.

s/Susan Pinkowski
SUSAN PINKOWSKI